## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

------------------------------------------------------------------------x
:
THE NEW MEXICO STATE INVESTMENT COUNCIL, :
as Trustee, Administrator and Custodian of the LAND :
GRANT PERMANENT FUND and the SEVERANCE :
TAX PERMANENT FUND, :
: CIVIL ACTION NO.
                Plaintiff, :
:
vs. :
:
SAUL MEYER, RENAISSANCE PRIVATE EQUITY :
PARTNERS, LP d/b/a ALDUS EQUITY PARTNERS, LP, :
MARC CORRERA, ANTHONY CORRERA, ALFRED :
JACKSON, DANIEL WEINSTEIN, VICKY L. SCHIFF, :
JULIO RAMIREZ, BARRETT WISSMAN, WILLIAM : JURY TRIAL DEMANDED
HOWELL, MARVIN ROSEN, DANIEL HEVESI, :
ELLIOTT BROIDY, MILTON ROBERT CARR, and :
HENRY MORRIS, :
:
                Defendants. :
:
------------------------------------------------------------------------x

## COMPLAINT

Plaintiff, the New Mexico State Investment Council ("NMSIC"), for its Complaint against the Defendants, herein alleges as follows:

### SUMMARY OF ALLEGATIONS

1. This action is brought by the Attorney General to obtain relief on behalf of the citizens of the State of New Mexico for an unlawful "pay-to-play" scheme perpetrated by the Defendants and others between 2003 and 2009.

2. During the relevant time period, Gary Bland ("Bland"), the New Mexico State Investment Officer; and Saul Meyer ("Meyer") of Renaissance Private Equity Partners, LP d/b/a

Aldus Equity Partners, LP ("Aldus"), an investment advisor to NMSIC, directed the process by which NMSIC made certain investments on behalf of two New Mexico public trust funds.

3. Bland, Meyer and Aldus had fiduciary duties to make and/or recommend investments based solely on the best interests of the public trust funds and their beneficiaries, the citizens of New Mexico.

4. Bland, Meyer and Aldus breached their fiduciary duties and corrupted the integrity of the investment process.

5. Bland, Meyer and Aldus wrongfully caused NMSIC to make investments on behalf of the public trust funds based on their own selfish interests and the personal, political and financial interests of politically-connected individuals and their associates, including Defendants named herein, rather than based solely on the best interests of the public trust funds and their beneficiaries, the citizens of New Mexico.

6. Bland, Meyer, and the politically-connected individuals who aided, abetted and profited from this pay-to-play scheme have been unjustly enriched and should be required to make restitution.

## THE PARTIES

7. Plaintiff, NMSIC, is a state agency that serves as trustee, administrator and custodian of the Land Grant Permanent Fund ("LGPF") and the Severance Tax Permanent Fund ("STPF") (collectively the "Public Trust Funds"), which are creatures of the New Mexico Constitution established for the benefit of the citizens of New Mexico, the real party in interest.

8. The LGPF is New Mexico's largest sovereign wealth permanent endowment fund. The LGPF is funded with income and royalties from the sale and lease of public trust land.

9. The STPF is another sovereign wealth permanent endowment fund. The STPF is funded with severance taxes on the extraction of minerals and oil and gas from leases on public lands.

10. The Public Trust Funds currently have a market value of approximately $15,000,000,000.00.

11. The Defendant Meyer is a citizen of the State of Texas.

12. The Defendant Aldus is a Texas limited partnership with a principal place of business in Dallas, Texas. Its partners are individuals who are citizens of the State of Texas. Therefore, Aldus is a citizen of the State of Texas.

13. The Defendant Marc Correra is a citizen of the State of Texas.

14. The Defendant Anthony Correra is a citizen of the State of New York.

15. The Defendant Alfred Jackson is citizen of the State of Texas.

16. The Defendant Daniel Weinstein is a citizen of the State of California.

17. The Defendant Vicky L. Schiff is a citizen of the State of California.

18. The Defendant Julio Ramirez is a citizen of the State of California.

19. The Defendant Barrett Wissman is a citizen of the State of Texas.

20. The Defendant William Howell is a citizen of the State of New York.

21. The Defendant Marvin Rosen is a citizen of the State of New York.

22. The Defendant Daniel Hevesi is a citizen of the State of New York.

23. The Defendant Elliott Broidy is a citizen of the State of California.

24. The Defendant Milton Robert Carr is a citizen of the District of Columbia.

25. The Defendant Henry ("Hank") Morris is a citizen of the State of New York.

26. In carrying out their scheme, Bland and the Defendants acted in concert with other individuals and business entities.

## JURISDICTION AND VENUE

27. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

28. Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events and omissions giving rise to the claim occurred in this district.

## FACTUAL BACKGROUND

**NMSIC's Alternative Investments**

29. NMSIC makes investments on behalf of the Public Trust Funds based on work performed under its supervision by the New Mexico State Investment Office ("NMSIO"), the State Investment Officer and third-party investment advisors.

30. NMSIC invests the Public Trust Funds' assets primarily in core portfolios of public equities and fixed income instruments, but also invests a portion of the assets in alternative investments, including private equity funds, hedge funds, real estate and fixed income derivatives.

31. Compared to the core portfolios of public equities and fixed income instruments, alternative investments generally present the prospect of superior returns and the risk of more substantial losses. Alternative investments are more complex and difficult to evaluate than the investments in the core portfolios.

**The Marketing of Alternative Investments**

32.     Alternative investments are often sold by investment management firms that seek to amass a pool of money – or commitments to fund money – primarily from institutional investors, including state and municipal public pension funds and public trust funds.

33.     Investment management firms typically receive substantial fees from investors for their role in managing alternative investments.

34.     Investment management firms sometimes share a portion of the fees they receive from a state public trust fund or other source of capital with third-party marketers who play a role in securing the investment for the investment management firms.

35.     A third-party marketer can serve a legitimate purpose and earn a legitimate fee acting as an intermediary between an investment management firm seeking to raise capital and an investor seeking investment opportunities.  Third-party marketers are often called placement agents.

36.     When the investor is a public pension or public trust fund, there is a danger that politically-connected individuals – usually people who make and solicit others to make political contributions to powerful public officials – will seek kickbacks in connection with the investment of public funds as a reward for their generosity and loyal efforts.

37.     There is a danger that politically-connected individuals will use improper influence to exert pressure on those controlling the investment process for their own financial or political benefit or for the financial or political benefit of their associates.

38.     There is a danger that investment management firms that benefit from the efforts of politically-connected individuals will agree to pay kickbacks disguised as legitimate placement agent fees.

**The New York Pay-to-Play Scheme**

39. Recent investigative and enforcement efforts by the U.S. Securities and Exchange Commission ("SEC") and the New York Attorney General ("NYAG") have revealed that such kickbacks were made as part of a "pay-to-play" scheme to defraud one of the largest public-pension funds in the country, the New York Common Retirement Fund ("NYCRF").

40. According to the enforcement agencies, the primary perpetrators of the scheme were Alan Hevesi, the former New York State Comptroller; Henry ("Hank") Morris ("Morris"), Alan Hevesi's top political advisor and chief fundraiser; and David Loglisci ("Loglisci"), the former New York State Deputy Comptroller. Beginning in 2003, Alan Hevesi, Morris and Loglisci devised and implemented a wide-ranging scheme to extract monetary payments and other benefits from investment management firms seeking to do business with the NYCRF. Pursuant to the scheme, the NYCRF invested billions of dollars with numerous investment management firms. Those investment management firms paid millions of dollars to Morris and others in the form of bogus finder or placement agent fees in order to obtain investments from the NYCRF.

41. Alan Hevesi, Morris and Loglisci have all pled guilty to criminal charges in connection with their roles in the New York scheme. Alan Hevesi has been sentenced to a term of one to four years in prison.

42. The New Mexico pay-to-play scheme that forms the basis for this action not only resembles the New York scheme in many respects, but also involves many of the same participants and investments.

**The New Mexico Pay-to-Play Scheme**

    **The Role Played by Gary Bland**

43.     One of the primary perpetrators of the pay-to-play scheme in New Mexico was Gary Bland, who, from January 14, 2003, through October 29, 2009, was the State Investment Officer.

44.     Bland was appointed by and reported to the former governor of New Mexico, Bill Richardson ("Governor Richardson").

45.     During his tenure, Bland was one of the highest paid state employees in the State of New Mexico. He received total salary payments of approximately $2,000,000.00.

46.     Under the New Mexico Constitution and statutes, Bland, as the State Investment Officer, chief administrator of NMSIO and a member of NMSIC, was a co-trustee of the Public Trust Funds and owed the beneficiaries of the Public Trust Funds, the citizens of New Mexico, a duty of loyalty to invest and manage the trust assets solely in the beneficiaries' interests.

47.     As a co-trustee of the Public Trust Funds, Bland had a fundamental duty to display, throughout the administration of the trust, complete loyalty to the interests of the citizens of New Mexico and to exclude all selfish interests and all consideration of the interests of third persons. Bland was not permitted, in any manner or to any degree, to subordinate the interests of the Public Trust Funds' beneficiaries to his own interests or the personal, financial or political interests of third parties.

48.     During Bland's tenure, Governor Richardson's supporters and senior members of his staff requested Bland to secure political contributions from investment management firms that had received fees in connection with investments made by the Public Trust Funds.

49.     During Bland's tenure, Anthony Correra, Governor Richardson's personal friend, fund raiser and confidante – and a member of the search committee involved in hiring Bland – set himself up, with the knowledge, approval and/or acquiescence of Bland and other government officials, as an unofficial investment consultant to NMSIO and NMSIC and a *de facto* gatekeeper of the Public Trust Funds' alternative investment portfolio.

50.     While Anthony Correra had a background in the investment industry working as an analyst and portfolio manager at various registered broker-dealers, he also had a history as a securities fraudster.  In 1990, the SEC charged Anthony Correra with trading in stock and options of various companies while in possession of inside information he obtained from a former stockbroker who received tips from an attorney in the mergers and acquisitions department of a major New York-based international law firm.  A federal district court permanently enjoined Anthony Correra from violating the antifraud provisions of the federal securities laws and ordered him to disgorge his illegal profits of $496,842.49.  The SEC barred Anthony Correra from association with any broker, dealer, investment adviser or municipal securities dealer.

51.     Acting in his role as self-appointed consultant and gatekeeper, and often purporting to speak on behalf of Governor Richardson, Anthony Correra instructed, requested and/or suggested that Bland cause NMSIC to make alternative investments that would benefit politically-connected individuals, many of whom made and solicited others to make contributions, directly or indirectly, to or for the benefit of Governor Richardson's election campaigns.

52.     During his tenure, Bland caused NMSIC to make alternative investments for the purpose of benefiting politically-connected individuals, rather than solely on the basis of the

underlying merits of the alternative investments. Collectively these investments involved a commitment of more than $2,000,000,000.00 of the Public Trust Funds' assets.

### The Role Played by Meyer and Aldus

53.     In 2003, NMSIC sought to engage a new advisor/consultant for its National Private Equity Program. Bland and others selected Aldus, even though it was just a fledgling firm, having been founded only months before. Indeed, NMSIC was only Aldus's second client. Aldus secured the lucrative engagement as the advisor/consultant for NMSIC's National Private Equity Program with help from several politically-connected individuals.

54.     Aldus was run by Meyer. Meyer was the Aldus partner with primary responsibility for advising NMSIC.

55.     On January 20, 2004, Bland signed a Professional Services Contract with Aldus on behalf of NMISC; Meyer signed on January 21, 2004, on behalf of Aldus.

56.     Under the terms of the Professional Services Contract, Aldus agreed to provide advisory services in connection with NMSIC's investment in private equity funds, including the performance of due diligence and the presentation of recommendations about specific potential investments.

57.     Over the course of Aldus's engagement, which was terminated on or about April 29, 2009, NMSIC paid Aldus more than $4,300,000.00.

58.     Under the terms of the Professional Services Contract, Aldus and Meyer, as agents of NMSIC, had fiduciary duties to act in the best interests of the Public Trust Funds and the citizens of New Mexico.

59.     In the Professional Services Contract, Aldus expressly warranted that it did not have and would not have any conflict of interest and promised to wholly indemnify the State of

New Mexico against any and all losses, damages, costs, expenses, legal fees and liability resulting from investment advice and other services provided for in the Professional Services Contract where Aldus had an interest, direct or indirect, that conflicted in any manner or degree with the best interests of the Public Trust Funds and the citizens of New Mexico.

60. Anthony Correra met with Meyer on numerous occasions and, purporting to speak on behalf of Governor Richardson, would often instruct, request or suggest that Meyer cause NMSIC to make investments in certain private equity funds.

61. At one such meeting in or about 2004, Anthony Correra gave Meyer a significant cash payment and other valuable gifts. On information and belief, Anthony Correra gave the payment and other gifts both to reward actions already taken by Meyer consistent with Anthony Correra's instructions, requests and suggestions and to encourage Meyer to take additional actions consistent with his instructions, requests and suggestions.

62. With Bland's knowledge, approval and assistance, Aldus and Meyer caused NMSIC to make alternative investments for the purpose of benefiting politically-connected individuals, including the principals of fund management firms and placement agent firms.

63. Collectively, these investments involved a commitment of more than $1,000,000,000.00 of the Public Trust Funds' assets.

64. Meyer used Aldus's position as an investment advisor to NMSIC to curry favor with powerful entities and individuals in the major financial centers and advance his own agenda for Aldus's business growth. Meyer created a far-reaching scheme that extended beyond NMSIC and beyond New Mexico, pursuant to which he traded favors for his own personal benefit and for the benefit of his connections, friends, colleagues and associates. Meyer maintained a

national network of politically-connected individuals among whom he allocated favors and placement agent fees.

65.     As part of the pay-to-play scheme that extended beyond NMSIC, Aldus and Meyer became the private equity investment advisor for a sister New Mexico agency, the Educational Retirement Board ("ERB").  From October 28, 2005, through October 21, 2009, Bland was a trustee of the ERB.  Bland used his position at the ERB to help Aldus and Meyer obtain the ERB advisory engagement and to carry out their scheme.

66.     The ERB has accused Aldus and Meyer of wrongdoing in connection with Aldus's role both as an investment advisor and as a participant with the ERB in a co-investment fund.  On October 18, 2010, the ERB commenced a civil action against Aldus, Meyer and various Aldus affiliates and principals asserting those claims in the New Mexico District Court.

**The Involvement of Meyer and Aldus in the New York Pay-to-Play Scheme**

67.      Aldus and Meyer were also involved in the New York pay-to-play scheme and accused of wrongdoing by the SEC, the NYAG and the New York State Comptroller's Office.

68.     On March 19, 2009, the SEC filed a complaint in New York alleging that Aldus and an "Aldus Partner" had agreed in May 2004 to pay nearly $320,000.00 in sham placement agent fees to Morris in exchange for Aldus being selected to manage $175,000,000.00 of NYCRF assets.  The SEC complaint further alleged that Aldus used the monies it was entrusted with managing for the NYCRF to invest in other funds, not for the benefit of the NYCRF, but in order to pay bogus placement agent fees associated with those investments to entities controlled by Morris.

69.     On April 30, 2009, the SEC filed an amended complaint in New York against Aldus, charging Aldus and Meyer directly with violations of the federal securities laws.

70. Also on April 30, 2009, the NYAG arrested Meyer after filing a criminal complaint against him based on the activities described in the SEC complaint.

**Meyer's Admission of Wrongdoing in New York and New Mexico**

71. On October 2, 2009, Meyer pled guilty to the criminal charges. In his allocution, Meyer admitted wrongdoing not only in connection with the New York pay-to-play scheme, but also in connection with the New Mexico pay-to-play scheme.

72. Meyer admitted that Aldus had fiduciary duties towards NMSIC and the ERB and was "obligated to provide objective investment advice, free from conflicts, politics and other improper pressures." He further admitted that, in order to generate business and fees for Aldus, he violated his fiduciary obligations and "succumbed to pressures exerted on [him] by pension fund officials and other politically connected individuals who [he] understood were motivated for personal, financial and political gain."

73. In his allocution, Meyer further admitted that he made false representations and concealed material information in connection with investment transactions involving NMSIC and the ERB.

74. In his allocution, Meyer further admitted that, as an advisor to NMSIC and the ERB,

> I had a fiduciary duty to act exclusively in the best interests of the State of New Mexico. On numerous occasions, however, contrary to my fiduciary duty, I ensured that Aldus recommended certain proposed investments that were pushed on me by politically-connected individuals in New Mexico. I did this knowing that these politically-connected individuals or their associates stood to benefit financially or politically from the investments and that the investments were not necessarily in the best economic interest of New Mexico.

**Politically-Connected Individuals' Receipt of Improper Payments**

75.   Many politically-connected individuals benefitted financially and politically from alternative investments made by NMSIC.

76.   Defendant Marc Correra, a politically-connected individual and the son of Anthony Correra, was paid millions of dollars in fees in connection with alternative investments made by NMSIC. Those payments were improper.

77.   Defendant Alfred Jackson ("Jackson"), another politically-connected individual, was paid millions of dollars in fees in connection with alternative investments made by NMSIC. Those payments were improper.

78.   Defendants Daniel Weinstein ("Weinstein") and Vicky L. Schiff ("Schiff") were politically-connected individuals and the principals of a placement agent firm known as DAV/Wetherly Financial, LP (collectively with its affiliates "Wetherly"). Wetherly was paid more than $1,000,000.00 in fees in connection with alternative investments made by NMSIC. Those payments were improper. The SEC and NYAG investigated Wetherly's involvement in the New York pay-to-play scheme. Wetherly settled with the NYAG for a cash payment.

79.   Defendant Julio Ramirez ("Ramirez"), another politically-connected individual, was paid substantial fees in connection with alternative investments made by NMSIC. Those payments were improper. Ramirez was also involved in the New York pay-to-play scheme and pled guilty to criminal charges of receiving improper payments.

80.   Guy Riordan ("Riordan"), another politically-connected individual, was paid substantial fees in connection with alternative investments made by NMSIC. Those payments were improper. Like Anthony Correra, Riordan was a member of the search committee involved in hiring Bland. In 2005, the SEC accused Riordan of paying kickbacks to former New Mexico

State Treasurer Michael Montoya in return for state business for Riordan's brokerage firm. The SEC barred Riordan from association with any broker or dealer and ordered him to cease and desist from committing or causing any future antifraud violations, to disgorge $938,353.78 (plus prejudgment interest) and to pay a civil monetary penalty of $500,000.00.

81. Defendant Barrett Wissman ("Wissman"), another politically-connected individual, was paid a substantial fee in connection with an alternative investment made by NMSIC. That payment was improper. Wissman was also involved in the New York scheme and pled guilty to criminal charges of making improper payments.

82. Defendant William Howell ("Howell"), another politically-connected individual, was paid substantial fees in connection with alternative investments made by NMSIC. Those payments were improper.

83. Defendant Marvin Rosen ("Rosen"), another politically-connected individual, was paid substantial fees in connection with alternative investments made by NMSIC. Those payments were improper.

84. Defendant Daniel Hevesi, another politically-connected individual and the son of Alan Hevesi, was paid a substantial fee in connection with an alternative investment made by NMSIC. That payment was improper.

85. Defendant Elliott Broidy ("Broidy"), another politically-connected individual, was paid a substantial fee in connection with an alternative investment made by NMSIC. That payment was improper. Broidy was also involved in the New York scheme and pled guilty to charges of making improper payments.

86. Defendant Milton Robert Carr ("Carr"), another politically-connected individual, was paid a substantial fee in connection with an alternative investment made by NMSIC. That payment was improper.

87. Defendant Henry ("Hank") Morris ("Morris"), another politically-connected individual, was paid a substantial fee in connection with at least one investment made by NMSIC. That payment was improper. Morris was one of the principal perpetrators of the New York scheme and pled guilty to criminal charges.

88. The fact that these and other politically-connected individuals received payments in connection with alternative investments made by NMSIC on behalf of the Public Trust Funds was never disclosed to the beneficiaries of the Public Trust Funds or to members of NMSIC, other than to those, like Bland, who had a disabling conflict of interest.

89. Instead, the politically-connected individuals used entities and, at times, acted as "sub-agents" in order to disguise their receipt of payments.

90. In many instances, the politically-connected individuals did little or no work in connection with the investments.

91. In some instances, Bland, Meyer and/or Aldus recommended to investment management firms that they use the services of a politically-connected individual masked as a placement agent.

92. In some instances, Bland, Meyer and/or Aldus kept NMSIC from giving business to investment management firms that refused to hire a politically-connected individual whose services they recommended.

## FIRST COUNT

### (Breach of Fiduciary Duty Against Meyer and Aldus)

93.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 92 of this Complaint as if fully set forth herein.

94.     Defendants Meyer and Aldus breached their fiduciary duties to the Public Trust Funds and the beneficiaries of those trust funds, the citizens of New Mexico, by causing NMSIC to make alternative investments pushed on them by politically-connected individuals, even though Aldus and Meyer knew not only that these politically-connected individuals or their associates stood to benefit financially or politically from the investments, but also that the investments were not necessarily in the best interests of New Mexico.

95.     Defendants Meyer and Aldus knew that Bland owed fiduciary duties to the Public Trust Funds and the beneficiaries of those trust funds, the citizens of New Mexico.

96.     Defendants Meyer and Aldus further breached their fiduciary duties to the Public Trust Funds and the beneficiaries of those trust funds, the citizens of New Mexico, by knowingly and intentionally providing substantial assistance and encouragement to Bland to breach his fiduciary duties.

97.     The Public Trust Funds and their beneficiaries have been damaged by Defendants Meyer's and Aldus's breaches of their fiduciary duties.

## SECOND COUNT

### (Breach of Contract Against Aldus)

98.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 97 of this Complaint as if fully set forth herein.

99.     Aldus breached the Professional Services Contract by providing investment advice and other services to NMSIC when it had an interest that conflicted with the best interests of the Public Trust Funds and the citizens of New Mexico.

100.    The Public Trust Funds and their beneficiaries have been damaged by Defendant Aldus's breach of the Professional Services Contract.

## THIRD COUNT

### (Aiding and Abetting Breach of Fiduciary Duty Against Marc Correra, Anthony Correra, Jackson, Weinstein, Schiff, Ramirez, Wissman, Howell, Rosen, Daniel Hevesi, Broidy, Carr and Morris)

101.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 100 of this Complaint as if fully set forth herein.

102.    Defendants Marc Correra, Anthony Correra, Jackson, Weinstein, Schiff, Ramirez, Wissman, Howell, Rosen, Daniel Hevesi, Broidy, Carr and Morris (collectively the "Aiding and Abetting Defendants") knew that Bland, Meyer and Aldus owed fiduciary duties to the Public Trust Funds and the beneficiaries of those trust funds, the citizens of New Mexico.

103.    The Aiding and Abetting Defendants aided and abetted Bland's, Meyer's and Aldus's breaches of their fiduciary duties to the Public Trust Funds and the beneficiaries of those trust funds, the citizens of New Mexico, by knowingly and intentionally providing substantial assistance and encouragement to Bland, Meyer and Aldus in connection with one or more alternative investments made by NMSIC.

104.    The Public Trust Funds and their beneficiaries have been damaged by the Aiding and Abetting Defendants' aiding and abetting Bland's, Meyer's and Aldus's breaches of their fiduciary duties.

## **FOURTH COUNT**

**(Unjust Enrichment Against All Defendants Except Aldus)**

105. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 104 of this Complaint as if fully set forth herein.

106. Defendants were unjustly enriched at the expense of and to the detriment of the Plaintiff, the Public Trust Funds and the citizens of the State of New Mexico.

107. Defendants' retention of monies wrongfully collected, directly and indirectly, from the Plaintiff, the Public Trust Funds and the citizens of the State of New Mexico violates fundamental principles of justice, equity and good conscience.

WHEREFORE, Plaintiff prays for relief and judgment as follows:

1. Compensatory damages.

2. Punitive damages.

3. Statutory interest.

4. Such other and further relief as this Court may deem necessary and just.

Dated: May 6, 2011

        **GARY K. KING,**
        **Attorney General of New Mexico**

        /s/ Scott Fuqua
        Scott Fuqua
        New Mexico Attorney General's Office
        408 Galisteo Street
        Santa Fe, New Mexico 87501
        (505) 827-6920 – Telephone
        (505) 827-6036 – Facsimile

        and

        Special Assistant Attorneys General
        Jeffrey Plotkin
        Kenneth W. Ritt
        Clifford E. Nichols III
        Matthew E. Smith
        Day Pitney LLP
        One Canterbury Green
        Stamford, Connecticut 06901
        (203) 977-7300
        (203) 977-7301 (Fax)

        *Attorneys for Plaintiff*